With the attorneys, we're going to argue, I assume it's you too. Please step up to the microphone and state your name and spell your names. Good afternoon. Jonathan Lubin, L-U-B-I-N, on behalf of the plaintiff's appellants. Good afternoon. Ann Kelly, K-E-L-L-Y, on behalf of the appellants, Joanna Arias and Marco Pinto. Now, you each have 20 minutes, but you don't have to use it. Do you want to reserve some of your time, sir? I'll reserve five minutes. This is your honor, I'll use 15 more minutes. Okay, great. Now, and then one other thing. Keep your voices up, please. The microphone doesn't amplify at all. So the folks, the people in the peanut gallery can hear it. We need to keep your voices up. Thanks. Those in court of mind, if I have my phone set next to me, just for the purpose of timekeeping, I have it on my phone. Just know that we aren't that particular about time, so don't worry about that. We don't want you taking any calls, sir. No, it's on air for a moment. You know, if I get a call from someone I like who could potentially help me out, maybe I'll. May it please the court. Yeah, look, just give me the time. Oh, okay, yeah, there's a clock right there. Your time is up. No, no. We're already an hour into it. Thank you, Your Honors. This has been a lot of fun. It's a wonderful day. May it please the court, counsel. Thank you very much for agreeing to hear this oral argument. I know that that's somewhat rare, though. It's becoming less rare, and it's certainly exciting for me to appear here. The facts are, at some point I referred to the facts as convoluted, but within 30 seconds, to the best of my ability, the facts are kind of like this. There are two properties that are back-to-back, one another, one of them on Monticello, the other on Lawndale in Roger Lincolnwood. And in the 1920s about, there was an alleyway that was zoned in between these two properties, eight feet of it on one side of the property, eight feet on the other property. And that alleyway was never developed. Nothing ever happened with that alleyway. In 1965, a number of alleyways that are similar to this alleyway were de-zoned, and the properties were split. Eight feet went to one property, eight feet went to the other property. In the case of this particular alleyway, it wasn't de-zoned until 2008. All of this, admittedly, I did not know when the complaint was filed. When the complaint was filed, the story is very simple. My client had bought this property. A fence had been on this property, which delineated what he thought was a property line. That defense included the eight feet that was on his side of that alleyway, the eight feet that was on the Pinto side of the alleyway. Did the facts in the case indicate what, at the closing, when he bought the house, I assume there was a title. Was that in the record, the title? The title that he was given at closing, I don't think ever did get into the record. But we can't consider it. Right. Well, it was dealt with on, and counsel, correct me if I'm wrong right now, but correct me if I'm wrong. Since the matter was dealt with on the pleading stage, all we have is the complaint and the motion to dismiss. So anyway, with that, that would be evidence, and it would be important evidence, but we don't get the evidence if the complaint is dismissed. So what I'm asking you is for the. Well, we do have the deed. Yes. We do have the deed in the record, and the legal description does not include the vacated part of the alley. I think that's correct. I'm sorry. I just want to shift that. Sorry. But I think your argument is that the legal description has nothing to do with this, because adverse possession very rarely is the land that you're attempting to acquire by adverse possession included in your legal description. Correct. It's basically the claim of right and other reasons that you might believe that you have a right to that land. Absolutely. Absolutely correct. The complaint said that, and this is how I was getting off on it, that paragraph nine, purchased the property anticipating that the property line was where the fence existed when the property was purchased, which is what you just said. Yeah. But there's, that fence was on the defendant's property. Correct. If someone had taken a measuring stick and measured it out, they may have been able to discover that the legal description of the property and the placement of the fence were at odds with one another. That's true. I don't think I'm conceding anything by admitting that. But I mean, what I'm saying is that that fence was consistent with an alley existing because it was not in the 16 feet. It was on the defendant's property putting up against the 16 feet. Correct. So if at some point someone had decided, well, the whole 16-foot alleyway is mine, and they put the fence in order to delineate that 16-foot alleyway being mine, it would have been exactly where the fence was. So the fence was not within the 16 feet. It was, I mean, I don't know whether it was an inch outside of it, an inch inside of it, but essentially that fence fenced in the whole 16 feet. Right. Well, it didn't fence it in on the sides, as I understand it. It didn't go east and west. It just went north and south across the back of the, at least it wasn't raised. So it's subject to interpretation. And, you know, as Justice Hyman said, we can't get into things that aren't in the record. But typically at a closing you get a survey. Typically the survey is staked. Typically, you know, I mean, you get a title policy. It has all of these things that we're asking about. But that's not in the record because this was a, you're right, it was a motion to dismiss. Right. All potentially fodder for discovery. Absolutely. But at this stage, and I don't know the answers to some of the, I know Your Honor didn't ask any questions, but you said this is what typically happened, and I don't know if the things that typically happen happen in this case. I don't know because we never got there. So, you know, where we stand now, and I want to get into some nitty-gritty just real quick. If I could ask you just another preliminary question. Sure. Thanks. You know, the defendant spends quite a bit of time talking about common law dedication versus statutory or whatever. You're not basing your claim on common law dedication, are you? No. Justice, all of the cases that I read about this matter, all of the cases that I cited about this matter, and just so I could, I believe that all of the cases that actually deal with this matter I have read and now cited. I'm now an expert on this very, very limited subject. None of them dealt with the distinction between common law dedication and statutory because the question is adverse possession. And there's not a single case that I've seen that says adverse possession doesn't apply if the dedication looks like this instead of the dedication looks like that. The question is always is the dedication, when it comes to public land, the question is, when I say public land, I mean land that's owned by the government, is that land for public use or is it for private use? And so, you know, I understand why counsel went into all those things. I don't think they're legally relevant here. I think the only question is whether this land was subject to adverse possession, either or both, as to Bilger-Lincolnwood and as to the Pinto property. But have you found any case where a municipality or governmental entity held property in the public trust, in which there was a finding of adverse possession? Brown. Brown is the subject. Well, but in that case, Brown was not against two neighbors. Brown involved in the municipality, right? Correct. So that's a difference. So and the way the courts have looked at that question with regard to, and I know this was in the briefs, with regard to the fact that whether a municipality is involved or a private individual. So there's no question here that in 2008, but that's not your argument because that's only 10 years. You're saying you've got to have at least 20. And so it had to have something had to happen before 2008. Let's put Brown on the side because it was a case involving a municipality. There's no case between two private individuals under this circumstance where the public trust was vacated and the two individuals fighting were fighting about what happened before. Correct. This is first impression for that purpose. For that purpose, this case is a case of first impression. And for that reason, one of the ways that I've gone about trying to understand it is I've said this to myself, but now I'll say it to you. Imagine there are two cases that are separate from one another, two hypotheticals. And the first hypothetical is just your plain vanilla adverse possession case, which is what the complaints set out, right? The complaint was a plain vanilla adverse possession case, and if it wasn't for the issue, the alleyway was only being vacated in 2008. I think it would have been a plain vanilla adverse possession case. There would have been some interesting discovery having to do with it. But I don't think there's really much question. I would submit to the Court that there isn't much question that if the facts were as I understood them in the complaint, that this would be a good case for adverse possession. We could fight about the details down the road in discovery. So that's hypothetical A, good claim of adverse possession, vanilla claim of adverse possession, but a good claim of adverse possession, potentially subject to evidence. Then you have the other hypothetical, which is a case of adverse possession as to the government. And in that case, the question is, of course, whether the land was held for public use or whether it was held for private use. And as Brown says, when a land is held for public use, it's for the use of the entire public, and the entire public includes everyone in the state. And so it gives you a list of things that could be public use. It could be streets. It could be highways. And that's kind of your list. J. and A. Cantore, hope I pronounced that correctly. No, not that one. It's more in the Metropolitan Water Reclamation District expanded what the public use could be. Now it has to do with land that's used for the sake of redirecting waterways. All these things are very, very clearly public use, and not public use in the sense of government, public use in the sense of anyone in the state could benefit from the fact that the government owns this land. As compared to, Your Honor, it looks like you're going to ask the question. No, go ahead. I think you're going to get to it. As compared to purely private use, and it gives a list of things that are purely private use, a potential school district, a fire department, things like that, which are very public in their nature, but in terms of this issue are private because they only benefit either whether it's people of this municipality or even people within the municipality, a specific subset of people in this municipality. In this case, you don't even get there because these alleyways were never turned into alleyways. They remained grass.  Well, you're not saying the concept of an alley is not public. Because that's how you're going to get in the breeze. All they do is pick up garbage in it, but it's an egress for the properties that are abiding it. But, I mean, they're open to the public, and for whatever need the public might need, they're there, right? So are libraries, and so are potentially school districts, so are parks. These are things that have been identified, parks not. But an alleyway is more like a street, a highway. But, I mean, the idea back in the 20s when all this developed, the municipality thought, well, maybe someday we'll have an alleyway there, right? Correct. Under your scenario, are you saying that if the municipality doesn't decide with the 20 years of that date, then they're out of luck? Because that seems to be part of what you're saying. And they can't, so they only have 20 years as public use, otherwise, of public trust. Otherwise, they could lose a right as a result of what somebody who abuts the property is doing. I think that's a question in almost any adverse possession case. I want to answer the question, but I want to make sure that's clear. I'm arguing two things, really, as to that question. One, alleyways should be considered a private use for a reason that I'm going to get to in a second. And, two, since these were never turned into alleyways, even if Your Honors find that alleyways are public use, nonetheless, in this case, these alleyways were private use because there were no alleyways. But that's my question. Why can't a municipality wait 100 years? Why can't they wait 200? Sometimes streets are turned into, they say, we're going to turn this into a park or something. We had it for public use. Now we're going to give it up or we're going to give it for building or whatever it is. But what you're saying is that in order for you to win, you have to go before 2008. So you can't win without our making some kind of decision on public use. Correct. Okay. So public use is a very easy standard to use because in 1965, four properties, they gave up the public use. No question. And they waited until 2008. And then they studied it. They said, we're not going to use it. It's just on paper. We'll get rid of it. Okay. Why can't a municipality make that decision? Why should they be forced? If we rule in your favor, aren't we forcing a municipality that doesn't have to do something within 20 years? Otherwise, they're going to be at risk. Well, it's a good question, but I think that the question is true whenever you have a case of adverse possession. Adverse possession isn't something that happens overnight. It's something that has to happen by law over 20 years. Well, but not in the case of a public use. A public use is a special category. Again, there is no question that there's 10 years. Once they gave that up, there's no question about it. But before that time, what we would be doing, even though they're not a party here, we would be making a decision based upon what happened when they did own the property. And they're not even a party to this case. So you're saying it has some effect of what the municipality did, which is they're not even a part of this. So I'm trying to get my hands around it. Sure. Part of me is jumping out and saying, great, so during discovery, let the municipality come and say, this is what we would have done, this is what our opinion was. But to answer Your Honor's question, I think the answer to that is in Township of Jubilee v. State. I think the situation was somewhat similar to that in which the determination was, since the municipality said we will let you use this land for whatever purpose you want to use it for, but it was clear that it was the government that owned the land. Therefore, adverse possession didn't begin to run because the use was permissible. And that's all that the municipality would have had to do in that. And that's the same story in any case of adverse possession. If I walk out every ten years and I say, look, I understand that you built this fence within my property line and eight feet of this land is mine and not yours, but I just want to let you know that I'm letting you use it, that you can continue to use it, use it in good health, then another ten years I do the same thing, hey guys, I just want you to know, make a memorialization of it so no court comes later and says you didn't do that. Boom, adverse possession doesn't begin because it's not adverse. It's not adverse. But that's not an issue in this case. To follow up on Justice Hyman, so at what point does the municipality lose it? So 1947 they lost it because that's 20 years from when they applied a subdivision or is it some other time that they lose it? Just as a diversion here real quick, we're only dealing with eight feet. Because your client owns the other eight feet. We're talking about 16, but when it was vacated, they got it. But anyway, so when would they lose it though? How would a municipality know, hey, we've got to take action or we've got to give them permission or we've got to do something or we're going to lose all of these, all of these 12 and 15 and all kinds of land that the municipality may be owning and not using at that point. So I think the answer to that is 20 years, which is a huge amount of time. So 1937. Yeah, that's what I think. Or not exactly. Wouldn't it be 20 years from the date that that possession begun? Oh, yeah, absolutely. Would it be from the open notorious and under claim of right? So it's not necessarily some magical date as the other justices seem to be creating. It's really from the time that that possession began, 20 years from there. Correct. I'm sorry. How would we define the possession in a case like this? In this case, the land was used by, you know, there's a fence that's there. Use your client as an example. You need to use your client as an example, otherwise it doesn't work. Sure. The fence is there. Yeah, this is a great hypothetical. It's what actually happened. The fence is there. He's got a barbecue out there. He's got a swing set out there. The kids are playing out there. You know, there's no trash collectors coming up and down this so-called alleyway collecting trash. I mean, that's the adverse possession. Sure. And that would be the adverse possession. It's not necessarily available to the public. Right. It's more like that firehouse that you referred to earlier. Correct. And that would be the adverse possession as to the Pinto lot. That's what's so magical about this. So if the village, prior to them vacating it, decided to put an alley in, they couldn't, right, because of the swing set. The other people in the block couldn't get an alley because of the swing set. If this was a case between Mezal and Village of Lincolnwood, I think that we would have the superior right. That's correct. At that point, I see that I'm, I don't know, we're on 20 minutes, 15 minutes. I'd like to reserve a couple of minutes to respond. Thanks a lot. Thank you. Thank you, Your Honors. Thank you. May it please the Court. Ann Kelly for Appellees JoAnna Arias and Marco Pinto. And today we are asking that Your Honors affirm Honorable Taylor's decision below, granting their section, combined section 615, 619, motion to dismiss and swear. Why does it matter, why do you think it does not matter that there was a fence there, that there was a barbecue there, that there was a play swing set there, that children have been playing there for years and years? Why are we to simply ignore all that? Because, Your Honor, the Illinois' established system is a statutory system of mechanical legal entitlement based upon the Platt Act and the Vacation Act that answers these questions that I think that Your Honors have been grappling with. Well, then wouldn't everyone lose, wouldn't all of our municipalities have lost these alleys 20 years after the subdivision Platt's were recorded? The Platt Act and the Vacation Act give us the prescribed procedural mechanism by which they answer these questions that say, no, your alleys are not usurped by virtue of adverse possession because you have complied with the prerequisites set forth in the Platt Act. This is an effective statutory dedication fulfilling all the formal requisites. Well, would it matter whether, in this case, we know it was reserved possibly for an alleyway. I mean, we also know that if it was for a public library or a fire station, something different would have happened. So doesn't it depend on what exactly was the use or the reason for the reservation of that property? And isn't that a question of fact that should not be decided on a motion to dismiss? Your Honor, that is a question of law and it's 100 percent decisive based upon the recorded Platt. And in this case, the Platt says, designates the alley as a public alley as a matter of law by use of the word public. It is a public use held vested to the municipality in trust for the public use. So this property is for a public fire station. It's a public fire station. That's my scenario. I'm sorry. My scenario is the land is reserved for a public fire station. If the word public was on the recorded Platt and the Platt was in compliance with the prerequisites, with the requirements of the Platt Act, then, yes, as a matter of law, by underneath the Platt Act, it would be deemed to be held in trust by the municipality for the public use. And only it would be a fee simple determinable by the vacation pursuant to the Vacation Act. So what you're saying is this whole case is all around whether the Platt, or at the beginning, they put the word public in there. That's the end all, be all. No other questions. Yes, Your Honor. It's just positive. Nobody can question that. When they put the word public in, that's the end of the matter. It can be no issue even if they put the word public in. And it turned out that it was going to be used for a McDonald's. In that case, Your Honor, the distinction there is that when the municipality is given a public alley and they are not allowed to then alienate or dispose of that property for private use, which by private, the law means proprietary. Or then if the city were to sell the public alley to McDonald's and keep the profit, that violates the terms of their fee. The reason for which they were given that fee was of interest. So when somebody whose property had been sold for that McDonald's, they could go in and get, if it's been 20 years, because they used it for a McDonald's rather than as an alleyway? Would that open up the? I don't think that would be an adverse possession type scenario. That would be a scenario where, let's see, in the Miller case, which Miller v. Metropolitan water reclamation case, and public land was leased to a public golf course. They said that was fine. I'm sorry, maybe it was the Mitchell case. One of the cases that I cite in the brief, the municipality was trying to sell the land to a private contractor to be developed in their private residence. And the recourse there where the citizens came and said, no, that violates, you're not allowed to do that. And, you know, in that sense, they would have lost title. And then I guess that land would have been subject to adverse possession. So had they done that, they would have lost, you know, that land would have been upon their sale of the property. But that's a question of fact. Then we can't decide this on a motion to dismiss? In that particular instance, it is. But that's not what we have here, Your Honor. How do we know? Because, if I may, I am walking over here to my very last blown-up demonstrative here. And this is a blow-up of the 1927 subdivision plan. And this is just particular areas of relevance that I've blown up here. And over on the right, these are just the formalities that have been fulfilled. And the Plan Act says that if you fulfill these things, then the fee is vested in the city, held in trust for the public purpose. So you see it's reported. We have the owner's signature. The city is signed here, the surveyor. And here is our Block 11 and the destination public alley, right north to the south, down the middle, Lots 13 and 14 being the Moselle property, Lots 28 and 27 being the Pinto Lots. This word public is dispositive. In the Cantoria case that we, that is tied in both of the briefs, the only reason why there was a factual agreement there is because the part that was at issue in that case wasn't this name of the plaque as public. So the court said, okay, well, I'm going to figure out the meaning of the plaque. Because again, if you go back to the Torlop case that I cite, the only agreement is that in the four corners of the plaque, whether the donation, the intent to donate to the public, is apparent to the plaque. And that element, dispositive, when you use the word public. And once that word public is used, the intent to donate to the public, and for the municipality to then hold it, and that's the feature of the fee, is established. And that, as you can see, is C-59-60. That is the reference to the record there. So, Your Honor, when we were talking about the Cantoria case, the only reason they delved into the factual inquiry there, and by factual inquiry, again, that was limited to the plaque, whether that intent to dedicate to the public was evident from the plaque. The only reason why that was, why the court delved into that is because the word public wasn't in front of the plaque. Isn't the problem, one of the problems, possibly, with the Mausel's argument that if we take that their property, the swing and the fence and everything was built right there, but no one else along that public alleyway did it. So then the city says, oh, we're going to build the alleyway in 1990. Now they've got a problem. If we rule for the Mausel's, they could hold up, the alleyway couldn't be built. They'd have to buy back the property that's been possessed adversely, right? Because that's right in the middle of it, wherever it is on that alleyway. Not everybody along the alleyway had adverse possession. What I'm saying is that basically, what your argument is, is that the best, that by following the statute and make it a term on when it's vacated, makes it clear and protects the public in the event that someone along a property line that has a public portion decides to do something adverse. Precisely, Your Honor. And that is why the Platt Act exists and why the Vacation Act exists. It provides certainty. It provides certainty, so in this instance... So your argument is that the use of the word public provides a blanket exemption. And you believe that it doesn't matter, regardless of the use of that strip of land, because it seems to me there's some case law that supports this idea that whether or not it actually falls within the definition of public depends upon the use of the strip. Your Honor, and those cases are... That's a third district case that I think supports the idea that I'm raising right now. I don't know off the top of my head which case you're talking about, but when it comes to the analysis of the type of use, that is usually a common law dedication type inquiry. But the word public use, I mean, again, the inquiry is, was it donated to the public, held by the city for that purpose? It's not whether the city actually used it for that purpose and it functioned for that purpose, because once we get the donation, it's there. And in this instance, beyond that, the reason why the fence was where it was is because the city had been asserting dominion over it and saying, no, I'm not going to issue the permit. Fences can't encroach on public properties. That's a rule that we have in this municipality. So, no, your fence must be outside the alley. And, by the way, Your Honors, the fence also had a gate, and that fence was the Pentola owners, their predecessors, the Steinbergs, that was their fence, and it had a gate opening up to that alley. I think I sort of went astray. So the fence was there long before the current owners acquired the property, correct? Yes. And it's very well practical that the current owners believed that this belonged to them, regardless of what the plan of surveying shows, regardless of what the legal description shows. They believed this belonged to them, this strip of land, all 16 feet of it. Your Honor, the fence is... Is that correct? No, Your Honor. You would say that you don't believe that they believed it? No, Your Honor. I mean, that's a factual issue that the trial question would allow you guys to consider and work through. I would say that, as a matter of law, demoiselles are deemed to have constructive notice of all matters within their chain of title. And here, the vacation ordinance was within their chain of title. They purchased the property... But adverse possession is usually not a part of chain of title. It's usually not a part of a legal description. It's usually not... Sometimes it's not a part of a survey. That's why it's called adverse possession. It's based upon other criteria. It's not based upon what's shown in the title survey or what's shown in the legal description. Otherwise, property would never be acquired by adverse possession. So that argument makes no sense to me. You can continue arguing. In terms of the constructive notice element that I was touching on there, that the Hatcham case and the Mann case that I cite, they say that all matters of public record are deemed to have notice when you purchase the property. And here, the vacation ordinance specifically said that the land had already been vested, the simple title down the middle, to the abetting landowners. And the fence, in and of itself, had a gate opening up. And it enclosed the Pinto's property. The gate, I would see here, the photo of the gate is at C-24, and the bid is at C-94 that indicates the gate. So that would negate the elements of exclusivity beyond the fact, you know, the adverse possession immunity issue. And in terms of the constructive notice in the paragraph 9 of the complaint, which I believe Your Honor touched upon, in terms of reasonable anticipation that the property was theirs, the Mazette's deed, also in the record, having been attached as a public record to the motion to dismiss, includes the therefore eight feet of the property as the second parcel. And also attached to the motion to dismiss were the Pinto's, the Pinto's affidavit. Attached to that was the survey that they obtained when they bought the property, and included in that was parcel 2, their eighth foot part of the strip. Judicial notice also can be taken of the City of Lincoln Woods GIS, Geographical Information System records, which shows in 2006, before the vacation, that the property line was outside, was outside the 16th foot in 2008, post-vacation, down the hill. Isn't the answer to, one possible answer to Justice Walker's question, that what Mazette knew or didn't know is irrelevant? Isn't that what the judge ruled? It really doesn't matter? I mean, there's no set of facts that would allow this complaint to go forward. That's what the judge is saying on the motion to dismiss. So knowledge by themselves is irrelevant to determining the nature of this issue because it's a question of law and following the statutes. And in order, we would be violating the statutes and the rights for public trust should we get into the facts. Correct, Your Honor. As a matter of law, as a matter of the recorded ordinance, the recorded subdivision plat, the plat act, the vacation act, there is no viable claim for adverse possession. The claim is preempted and it cannot possibly be alleged. Getting it when I was talking about reasonable notice, my secondary argument would be beyond that. It can't be alleged and the elements of adverse possession have been negated by virtue of the admissions and the exhibits and the other elements that are on the record. But, yes, as a matter of law, there is no viable claim for adverse possession because the plat act says if the premises are marked on the recorded plat as granted to the public and, two, the public entity accepts the dedication, then that becomes a, that it is and, quote, shall be held in law and equity as a conveyance in fee as donated or granted to the public for their use for the purposes therein named. That's just, it is, it shall be held in law and equity as a public property. And section 13-10, dash 111 says it's the exceptions to the Illinois Limitations Act saying that adverse possession shall not extend to lands held for any public purpose. Here we have public value statutorily dedicated in compliance with the plat act. Underneath the plat act, which states it is held in trust for the public purpose and the exceptions to the limitations act says adverse possession does not apply to land held for public purpose. And the vacation, the vacation ordinance, which I also have a blurb there, if your honors, if that would be helpful, it follows, it tracks, it cites the vacation plat statute. It tracks the language of it. The city of Lincolnwood followed the plat act and the vacation act to the spirit to the letter. They prescribed to the statutory process that has been late set forth since over a century here in Illinois. The public alley doesn't need as such vested in fee and held in trust as a public alley, as a matter of law. This case would disagree with a whole bunch of stuff you're saying. This is a third district appellate court case, August 2nd, 1990, found at 202 Illap 3rd, 750. And this case disagrees with everything you just said in the last five minutes. You're probably not familiar with it, but it's again, it's W-A-N-L-E-S-S versus W-R-A-I-G-H-T. It's third district appellate court cited at 202 Illap 3rd, 750. Then your honor, off the top of my head, I am not familiar with that case. I did find that back then we used page numbers. It's at page number 458, 459. I'm sorry, no, it's page 752. And it seems to be clear that it depends upon the use of the property, even though it has been, because you seem to make an argument that just because it says public use, that there could never be adverse possession against the municipality. And the third district disagrees with it. That is what I set forth, the arguments I set forth. I'm just letting you know the third district disagrees with me. I, I, my, yes, your honor. I, I think that as a matter of law. And if you guys aren't familiar with the case, counsel may not be familiar with it either. Okay. That is a petty's position that the use of the public is dispositive under the public act in terms of its being statutorily dedicated for the public use and held in trust. And beyond that, on the face of the pleadings, that the elements of adverse possession cannot be alleged or are negated. Okay. I think your time is about up. Thank you very much. Okay. Appellees would like to stand on their brief with regard to any points not broadly argued. Thank you, your honors. I changed my mind. I'm not an expert. Well, counsel, I don't think Justice Askew, though, because I think that both Justice Griffin and Justice Heineken kind of asked you this, and I don't know if I've got an answer. So you seem to think that the, once a property is designated for public use in a public trust, that individual private owners of other properties can just simply acquire possession, by adverse possession, even though it's in a public trust? I'd suggest that that's broadly. Just a second. Sure. Because I struggle with the whole, and I don't think, I think the justices probably have mentioned this already, the, I guess, really, we could call it a floodgate argument, that there'll be, this would go, this thing would go crazy throughout the state if we were to say properties held in a public trust can simply be acquired against the municipality by adverse possession. And I struggle with that. Sure. It's a great question, and I think it would have been a great question to ask the Brown Court, because I think the Brown Court answered that. But we, okay. Well, let's hear it. Sure. I mean, the Brown Court found that the determination is not the designation. It's not whether it was, it was, not a single case that I read, and I didn't read the 202 or Article 730. I'm not an expert, apparently. I didn't read that one. But not a single one. Not Brown, not Miller, not Cantor. And the latter two went against the plan. But in none of those cases was the question the nature of the plat, the nature of the designation. In all of those cases, the question was what is the use of the property in question? Has the use of the property been for the public benefit, or has the use of the property been private? And when they define private, private doesn't mean private individuals versus government. Private means are the people that benefit from this property the people in the municipality or the people who are a subset of the people in the municipality? And I think. And you're arguing that Aileys are not public. I'm, two things. There's one, there was no alley here. No, no. And I understand that part. But you're arguing that Aileys are not public use. Yes. So people can adversely acquire title to Aileys even after they're approved. Sure. But, Justice, that example, there's an alleyway that's in use, it's dedicated, it's owned by the public, and I just go out and I pitch a tent in the alleyway. I start to build my garage in the middle of the alleyway. It's going to take a week for that thing to be settled and for me to be at 555 West Harrison. It's going to take a week, Judge. But in theory, though. That's true. If you're at the end of the alley and nobody's driving down there, you could take it over by adverse possession even in a fully approved alley. Theoretically, yes. I think the answer to that is yes. What I would suggest is that what's happening in the Aileys argument is a confusion of the term public. The word public means different things in different contexts. When we refer to public land, what we mean is land that's owned by the government. But in Cantori, in Miller, in Brown, public refers to the use of the land, not the ownership of the land. All of the land's at issue, including the land in Brown, where it was found that adverse possession could divest the government of that land. It was all public land, but it was being used for a private purpose. The problem with your argument, though, and I'm citing to you, I'm looking at your brief, is that you actually distinguish because you say in Brown it's distinguished between streets and highways, which were presumptively for public use, and then merely local city offices, library site, use of fire department. If we had to decide whether an alleyway is like a street or a highway, or more like a city office is a library site or a fire department, I think that the decision would be to the former and not the latter. So that's why, secondly, what about my scenario? So the Steinbergs who own the land, they put up this fence and everything else, and nobody along that alleyway does anything else. And then a municipality, I'm making a scenario a little different, decides they're going to put the alleyway in. Well, under your scenario, they can't do it because the land has now been adversely possessed by the Steinbergs because of what they did, and at the same thing, 20 years they've had that fence up. And even though, as to everybody along that stretch, nothing else has changed. So that's why we have a statute, and you're supposed to be aware of the statutes. So I'm just saying what we're arguing at its essence is that we cannot follow the statutes with regard to procedures on public trust. Would you like me to respond to that? I don't know if my time is up. No, no. Just to be clear, that's a hypothetical. I don't know that the other houses on that street have it. That doesn't matter. It doesn't matter because that's the effect. If we should rule in your favor, this is a scenario that's quite possible. I mean, what we're doing is opening it up so that anybody and any public trust property could do something like this and put a barrier as a result of the test that you want us to use. I think that's correct. I think that's correct. And I think in time that you believe there's a response that municipalities should be aware of, that if they want the private use of these individuals not to be adverse possession, they just make sure that everyone knows that they're doing it with the permission of the government. And that's not what happened here. Okay. Go ahead. Your Honor, I'm confused for a second. Did you believe that that was the question, that the land was used by a private individual, but there was a sign that was placed, it was government land, and the government let this private individual use the land. And so the courts said, yeah, they'll use it. That's not adverse possession. But if there was a sign and they didn't say he could use it, he could get it by adverse possession. Absolutely. So how do they protect, how does the city of Chicago protect itself from adverse possession? I mean, what do they do? I agree with Justice Griffin. That's a difficult question. But as I read more into the third district case, it seems like that alleys might be distinguished from highways. Highways and streets benefit everyone in the state. Usually an alley is really a, an alley is not a throughway for just cars to drive down the alley to get around traffic. It may be something different. It is to me. I'm not sure. It is to me. I mean, I think you can take alleys. I'm not sure. I think that both lawyers probably should take a look at this case. If I ever get pulled over, I'll say you're on it. But I think they are different. And they're not for the purpose of, it's not a highway, it's not a street. I think they are different. And what can Chicago do? They can do what they're doing, which is ride their trucks through it almost every single week and pick up the garbage. And if there's something in the way of this item, send them to 555 West Harrison. Okay. Thank you. Thanks very much. Thanks very much. We appreciate it. We appreciate the work you've done, the arguments. Not 555 West Harrison. We'll take it under, we'll take it under advisement. I'm sorry. It was former West Superior I meant to say. Former West Superior, not 555. We knew it. Thanks.